# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-600


**STATE IN THE INTEREST OF C.M.C. & J.T.D.**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. J-54-10
HONORABLE C. STEVE GUNNELL, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


## SHANNON J. GREMILLION
## JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Jimmie C. Peters, James T. Genovese, and Shannon J. Gremillion, Judges.


**AFFIRMED.**

**David E. Marcantel**
**Marcantel, Marcantel, Wall, Pfeiffer and Stretcher**
**P. O. Box 1366**
**Jennings, LA 70546**
**(337) 824-7380**
**COUNSEL FOR APPELLANT:**
    **M.J.C. (mother)**

**Nicholas Pizzolatto Jr.**
**Louisiana Department of Children & Family Services**
**P.O. Box 1487**
**Lake Charles, LA 70602**
**(337) 491-2963**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Charles L. Bull Jr.**
**Attorney at Law**
**P. O. Box 400**
**Welsh, LA 70591**
**(337) 734-2811**
**COUNSEL FOR APPELLEE:**
  **Unknown Father of C.M.C.**

**William J. Riley III**
**Attorney at Law**
**P. O. Box 509**
**Jennings, LA 70546**
**(337) 824-9158**
**COUNSEL FOR APPELLEE:**
  **J.T.D. (father)**

**Jocelin Sias**
**Acadiana Legal Service Corporation**
**P. O. Box 2148**
**Lake Charles, LA 70602**
**(337) 439-0377**
**COUNSEL FOR APPELLEE:**
  **C.M.C. (child)**
  **J.T.D. (child)**

**GREMILLION, Judge**.

The mother, M.J.C., appeals the judgment of the trial court terminating her parental rights to her children, C.M.C. and J.T.D.[1] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The State filed a petition to adjudicate C.M.C., born September 25, 2007, and J.T.D., born January 27, 2010, as children in need of care on December 1, 2010. The supplemental affidavit of Shamira Lyons, a child protection investigator with the Louisiana Department of Children and Family Services,[2] attested that on October 18, 2010, C.M.C. was found wandering in the road in front of M.J.C.'s apartment complex. On November 8, 2010, the agency received a report that M.J.C. was using crack cocaine, had no electricity, food, or diapers, and was leaving the children unattended while she went out to use crack cocaine. On November 9, 2010, Lyons attempted to visit M.J.C. but was unsuccessful. On November 10, 2010, Lyons received information that M.J.C. appeared to be under the influence of drugs while she pushed J.T.D. in a stroller. Lyons was also informed that M.J.C. had been off her epilepsy medication for at least three weeks.

Lyons next spoke to the manager of the apartment complex where M.J.C. resided, who told Lyons that M.J.C. regularly left J.T.D. alone in the apartment. On November 10, 2010, Lyons interviewed M.J.C. and reported that she did have electricity, but only three wieners in the freezer and a couple of cans of beans in the cabinet while she awaited her food stamps. M.J.C. admitted to being out of her prescribed medication and to smoking crack cocaine the night before. Lyons

---

[1] Initials are used throughout to protect the identity of the minors in accordance with UNIFORM RULES—COURTS OF APPEAL, RULE 5-2.

[2] The Louisiana Department of Children and Family Services is, hereafter, referred to as DCFS or the agency.

interviewed another neighbor who confirmed that M.J.C. left the children alone and that they often appeared hungry.

On November 11, 2010, the apartment manager reported that M.J.C. had threatened to kill herself and was then transported to a hospital. Lyons further attested that M.J.C. had an extensive history of mental health issues, substance abuse issues, domestic violence issues, and parental fitness issues. She has several other children that were either removed from her care or custody was given to their fathers.

On November 15, 2010, another DCFS worker, Colleen Cox, attempted to pick up M.J.C. for a visit with her children, who were now in foster care. However, the apartment manager told Cox that M.J.C. called to inform him that she was in a drug treatment facility. Lyons later found out that M.J.C. had entered a detoxification program at a facility in Kaplan and that she would, thereafter, be entering a ninety-day treatment facility in Abbeville. On November 18, 2010, Cox was informed that M.J.C. had left the detoxification program against recommendation. On November 22, 2010, M.J.C. contacted DCFS to inquire about her children. DCFS was, thereafter, notified of M.J.C.'s mental health diagnosis. M.J.C. suffers from bipolar disorder, depressive disorder, obsessive compulsive disorder, bulimia, ADHD, depressive personality disorder, and epilepsy.

The record indicates that the children were removed from M.J.C.'s care pursuant to an Instanter Order issued on November 10, 2010, and filed on November 12, 2010. An extensive case plan was formulated for M.J.C.

On January 6, 2011, and July 28, 2011, hearings were held and custody was maintained with DCFS. Updated case plans were formulated. A November 2,

2011 report to the trial court by DCFS recommended that the children remain in its care.

A permanency hearing was held on December 8, 2011, at which the trial court suspended M.J.C.'s visits with her children. On December 27, 2011, DCFS filed a "Petition for Certification for Adoption and Termination of Parental Rights." Case review hearings were held on February 3, 2012, and February 23, 2012, and the trial court maintained the suspension of visitation. Following a March 15, 2012 hearing, M.J.C.'s parental rights were terminated in a judgment filed on March 21, 2012.[3] The children's custody was maintained with DCFS and both were freed for adoption. M.J.C. now appeals.

## ISSUES

M.J.C. assigns as error:

1. Whether or not the trial court erred by finding the State proved by clear and convincing evidence that [she] did not substantially comply with her case plan.

2. Whether or not the trial court erred by finding there is no reasonable expectation of significant improvement in [her] conduct in the near future.

3. Whether or not the trial court erred in finding that it is in the best interest of C.M.C. and J.T.D. that [her] parental rights are terminated.

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97–336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156; s*ee also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham County, NC*, 452

---

[3] The parental rights of the fathers of C.M.C and J.T.D. were also terminated. Neither is a party to this litigation.

U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount over that of the parent. *In re J.A.*, 99–2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

"[T]he trial court's determination regarding the termination of parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong." *In re V.F.R.*, 01–1041, p. 3-4 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, 1037, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412 (citing *In re S.M.W.*, 00-3277 (La. 2/21/01), 781 So.2d 1223).

***Testimony***

M.J.C. testified that she currently resides at the New Life Center for Women, a transitional housing center in Opelousas, run by the Lafayette Diocese.

4

She testified that she did not know who fathered C.M.C. and that she has six other children beside the two at issue here: The oldest child is in college, two are in the custody of their father, another is in the custody of her father, one was freed for adoption in 2005 pursuant to a termination of parental rights by DCFS, and the most recent one, born in November 2011, was also given up for adoption.

M.J.C. testified that she knew of the case plan that DCFS created for her in November 2010. She said that the requirements were to go to an Alcoholics Anonymous (AA) treatment facility. She stated that she went to a center in San Antonio, Texas, for six days and that she was trying to get the treatment she needed. She said she has been making phone calls and that she in on a waiting list for inpatient treatment. M.J.C. said that she does not drive.

M.J.C. testified that she has a safe place for her children to live at the New Life Center. She said that many children reside there, and that it has a daycare center. She said that she lived in her apartment for about six months and has since resided at the New Life Center. M.J.C. said that she is in a two-year program at the New Life Center. She admitted that she had no definite plans for the future other than that she had applied for disability benefits, which were denied, but that she was pursuing an appeal and would "look for work maybe to Mama's or something." She admitted that she had not completed drug treatment per her case plan because the one place she went to was "like a religious cult," so she left of her own accord.

M.J.C. testified that she has not been employed since the children entered into the care of DCFS. She stated that she has sixteen parenting certificates, which were required to receive welfare, but that she has not taken any parenting classes since the children at issue were removed from her care. However, she said she was going to take the agency-approved parenting courses required by the case plan.

5

When asked why she has not completed any part of her case plan in the past sixteen months, M.J.C. admitted she "messed up," but that she was "willing to do whatever." She said she goes to church four or five times per week and AA meetings and that she "[found] God" and "God alone opens doors." She further stated that she is not taking medication for her epilepsy because she would not be able to get into a treatment facility but instead goes to church to get her "healings."

Regarding her attempts at receiving substance abuse treatment, M.J.C. stated she had to leave the San Antonio facility because she knows the bible, and those people were "hypocrites."[4] She said she attempted another stay at an in-patient treatment facility for a few days, but a lady snapped at her so she left. She said she attends Narcotics Anonymous (NA) and AA and that she kicked her cocaine habit.

Jessica Frey, the second foster worker, testified that she had been working this case since May 2011. M.J.C. submitted to an assessment with the Jefferson Davis Addictive Disorders Clinic on December 2, 2010. The result of the assessment was a recommendation of inpatient treatment as soon as possible, but in the meantime it was recommended that M.J.C. attend the intensive outpatient program three times per week for eight weeks, attend at least one outside meeting a week for the duration of treatment, and complete at least three consecutive drug screens. Frey said M.J.C. was informed of the requirements and never followed any of the recommendations and never attended scheduled appointments. Thus, M.J.C. still needs to complete inpatient treatment per the case plan.

Frey said that M.J.C. failed to complete mental health rehabilitation as required by the case plan. Resource Management discharged her due to noncompliance. She further testified that the agency would never recommend sending children to live at a shelter as it is not considered stable housing. Frey said

---

[4] The word "hypocrites" is misspelled in the record as "Hippocrates."

6

M.J.C's scheduled visits with her children were initially sporadic and that there were times when she could not be found. Frey said that M.J.C. has not accomplished any of the goals set forth by DCFS in the past sixteen months. Frey testified that the children were placed together in adoptive placements and that C.M.C. was receiving psychiatric treatment for reactive attachment disorder.

Frey testified that DCFS recommended that the children be freed for adoption. On cross-examination, Frey admitted that DCFS had not requested any drug screen on M.J.C.; however she said that was because M.J.C. was open about her drug use. Frey was then questioned about a letter addressed to DCFS. Frey stated that she had never seen it. The letter, dated February 9, 2012, was written by a clinician at the Opelousas Addictive Disorders Clinic, who stated that "Based on the provided information by the individual, we find he/she is not needing our services for drug/alcohol treatment at this time."

Frey said she visited M.J.C. at the New Life Center. She denied seeing any children residing there. She said a transitional housing facility is not considered an acceptable residence.

Melody Walker testified that she works at the New Life Center where M.J.C. resides and is her case manager. She said that thirty to forty children reside there and M.J.C.'s children would be welcome. She said that the facility provides food to the residents and that the daycare facility is free to residents. Walker testified that M.J.C. had not appeared to have a drug problem in the seven months she had been living there. Walker admitted knowing M.J.C. from a previous stay in a different women's shelter. She said that the current shelter does not drug test. Walker said that some of the goals set for M.J.C. were for her to receive mental-health treatment, substance abuse treatment, get a job, and get her children back. However, Walker said that they have not been able to do much regarding mental

7

health treatment due to M.J.C.'s latest pregnancy during which she was unable to take her medication. Walker said the reason M.J.C. has not been taking any medication since the eighth child's birth in November 2011, is because you are not allowed to take medication in drug treatment facilities. She admitted that M.J.C. has never applied for a job to her knowledge.

Walker said she was trying to assist M.J.C. in receiving inpatient drug treatment so that she can get her children back. She said that she had received an assessment from Jefferson Davis Addictive Disorders in February 2012. Walker felt that M.J.C. had changed since her arrival seven months ago due to her religious practice, AA meetings, and the meetings at the shelter. She said that M.J.C. refuses to take medication for her epilepsy or bipolar disorder because she cannot enter a treatment facility while taking medication. Walker said that M.J.C. was able to function without medication for either disorder and did not jeopardize the safety of the other residents.

*Compliance with Case Plan*

DCFS argues that it proved by clear and convincing evidence that M.J.C. failed to comply with her case plan, which is a ground for termination pursuant to La.Ch.Code art. 1015(5). Louisiana Children's Code Article 1015(5) sets forth the following as grounds for involuntary termination:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

8

It also argues that pursuant to La.Ch.Code art. 1036(C), it has proven lack of parental compliance with the case plan. Louisiana Children's Code Article 1036(C) states:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

M.J.C. claims to have substantially complied with her case plan. In this case, factors one, two, and three are less important than M.J.C.'s complete failure to address factors five and six. Also, it should be noted that M.J.C.'s visits with C.M.C. were suspended by his treating psychologist in early December 2011. Moreover, there have been several occasions in which M.J.C. could not be located, or called DCFS and left no contact information. M.J.C. was required by the case plan to assist in the cost of her children's foster care. However, M.J.C. has never had an income, thus rendering payment impossible. Factors five and six are where M.J.C. fails on all accounts. M.J.C.'s case plan required her to:

9

**CASE PLAN:  Housing / Food / Basic Needs**

[M.J.C.] will demonstrate an ability to maintain a safe and clean environment by maintaining the same home for six months, keeping it free of any safety hazards, maintaining a supply of food, and keeping the home clean.

[M.J.C.] will demonstrate stability by maintaining employment and/or adequate legal income in  order to be financially capable of caring for herself and her family.  Her income should sufficiently supply the family's needs for food, shelter, utilities, clothing, etc.   [M.J.C.] should maintain her employment for at least six months consecutively. [M.J.C.] will provide the agency with proof of income every other month.

. . . .

[M.J.C.] will demonstrate financial responsibility by contributing payments toward the cost of the children's care while they are in foster care.

**CASE PLAN: Parent's Mental and Emotional Health**

[M.J.C] will attend required doctor appointments in order to understand her medical conditions and take necessary actions.

. . . .

[M.J.C.] will take medication as prescribed and not exceed required dosage.

**CASE PLAN: Parent's Substance Use**

[M.J.C.] will contact a substance abuse assessment/treatment resource in her area and schedule a substance abuse evaluation.

[M.J.C.] will complete/comply with her program assessments and recommendations.

[M.J.C.] will provide caseworker with documentation of participation/completion of substance abuse assessment/treatment.

[M.J.C.] will participate in and successfully complete an agency approved substance abuse treatment program.

[M.J.C.] will refrain from the use of any illegal substance.

A handwritten addition to the substance use section that M.J.C. initialed, notes that "no additional refe[rrals] can be made until substance abuse treatment is completed."

There is no dispute that M.J.C. failed to complete any of the required inpatient treatment. She left several facilities after only a few days. While M.J.C. argues she has been drug-free for over a year, this is insufficient to show substantial compliance with mental health treatment and inpatient substance abuse treatment. M.J.C. admittedly has had a drug problem for over thirteen years that is complicated by mental health issues.

M.J.C. has failed to redress the problems preventing reunification. She still has no stable housing, income, or means of providing for her children. She's receiving no medication for epilepsy or her mental health issues. We only have M.J.C.'s self-serving testimony that she has been-drug free for over a year. Had she complied with her case plan and been regularly drug-tested, this claim would carry more significance. Unfortunately, there has been no substantial improvement in the problems that prevent reunification. This assignment of error is without merit.

***Reasonable Expectation of Future Improvement***

DCFS also argues that it proved, by clear and convincing evidence that there was a lack of any reasonable expectation of significant improvement in M.J.C.'s conduct as evidenced by several factors set forth in La.Ch.Code art. 1036(D), which states:

> Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the

11

child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

M.J.C.'s primary argument that there is a reasonable expectation of significant improvement is that she has been drug-free for over one year. Again, this claim is self-serving and purely speculative. M.J.C. argues that her mental illness does not render her unable to care for her children. We disagree. M.J.C. suffers from extensive mental health issues and a lengthy drug addiction for which she has received no treatment. For the aforementioned reasons, the trial court did not manifestly err in finding that there is no expectation of significant improvement in these conditions and this assignment of error is without merit.

*Best Interests*

M.J.C. argues that it is not in the best interest of the children to terminate her rights because she can "provide a more stable environment" for C.M.C. and J.T.D. than the State can. We disagree. C.M.C. and J.T.D. are placed together in an adoptive home where the parents are addressing their extensive needs. The trial court did not manifestly err in finding that it was in the best interest of the children to be freed for adoption. This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court terminating M.J.C.'s parental right to her children, C.M.C. and J.T.D., is affirmed. All costs of this appeal are assessed against the defendant-appellant, M.J.C.

**AFFIRMED**.

12